UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| KENNETH NASH and | ) | |
|---|---|---|
| TAMMY WILLIAMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:16-cv-02849-RLY-MPB |
| | ) | |
| STATE OF INDIANA, | ) | |
| INDIANA STATE POLICE, | ) | |
| RYAN WINTERS, individually and in his | ) | |
| capacity as an Indiana State Trooper; | ) | |
| PETER STEPHAN,[1] individually and in his | ) | |
| capacity as an Indiana State Trooper; and | ) | |
| TWO UNKNOWN INDIANA STATE | ) | |
| TROOPERS, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In the early morning hours of January 6, 2016, Plaintiffs, Kenneth Nash and his fiancée, Tammy Williams, were traveling southbound on Interstate 65 near Lafayette, Indiana. Nash was driving a rented U-Haul with an auto transport trailer-in-tow that carried a 2004 Mercedes Benz owned by Williams. They were pulled over by Senior Trooper Ryan Winters of the Indiana State Police and his trainee, Trooper Colton Maynor. Two and a half hours later, Nash was issued a Traffic Warning Ticket. Between the initial stop and the issuance of the warning, the U-Haul and vehicle were searched, and Nash and Williams were interrogated in police squad cars at length.

---

[1] The parties spell Trooper Stephan's last name as "Stephan."

1

Nash and Williams sued the state of Indiana, the ISP, ISP Trooper Winters, and ISP Trooper Peter Stephan under 42 U.S.C. § 1983, alleging Fourth Amendment claims of unreasonable seizure, false arrest, and unreasonable search of the U-Haul and vehicle. They also bring an unreasonable search and seizure claim under Article I, § 11 of the Indiana Constitution, and a false arrest and false imprisonment claim under Indiana law. Defendants now move for summary judgment. For the reasons explained below, the court **DENIES** the motion.

I.     Background

Nash and Williams, who are both African American, were traveling southbound on Interstate 65 on their way to Atlanta, Georgia, on January 6, 2016. (Filing No. 32-1, Deposition of Ryan Winters ("Winters Dep.") at 34; Filing No. 47-2, Affidavit of Kenneth Nash ("Nash Aff.") ¶ 5; Filing No. 47-1, Affidavit of Tammy Williams ("Williams Aff.") ¶ 3). Nash was driving a rented U-Haul with an auto transport trailer-in-tow that carried Williams' vehicle. (Nash Aff. ¶ 3; Williams Aff. ¶ 6). At approximately 6:30 a.m., ISP Trooper Maynor was on a field training operation with Senior Trooper Winters in an unmarked vehicle. (Nash Aff. ¶ 6; Williams Aff. ¶ 4).

Winters testified he stopped Nash and Williams because the trailer towing the vehicle crossed the fog line "almost five times." (Winters Dep. at 59). Nash and Williams both testified they did not violate any traffic laws prior to the stop. (Nash Aff. ¶¶ 8, 13; Williams Aff. ¶¶ 6, 10)

As Winters approached the U-Haul, he noticed the vehicle in tow was not weighted down with personal belongings and found that suspicious. (Winters Dep. at

80). Winters asked Nash if he was on his cell phone or had been drinking; he replied "no." (Nash Aff. ¶ 11; Williams Aff. ¶ 14). Winters asked for Nash's driver's license and registration and proceeded to his squad car for a few minutes. When he returned, he ordered Nash into his squad car for additional questioning. (Winters Dep. at 76; Nash Aff. ¶¶ 14-15). Winters asked Nash about his relationship with Williams and where they were going, what hotel they stayed in, whether they had a fight, and other personal information. (Nash Aff. ¶ 19).

After about twenty minutes of questioning in the squad car, Winters asked if he and Maynor could search the U-Haul and vehicle in tow because the area of Interstate 65 they were in was known as a high drug trafficking area. (Nash Aff. ¶ 20). Nash responded in the negative, and said he did not have drugs and did not use drugs. (*Id.* ¶¶ 20-21). Following additional questioning, during which Nash continued to deny using or possessing drugs, Winters gave Nash a consent to search form and told him to sign it. (*Id.*). He reluctantly agreed to sign the form because he did not feel he had a choice. (*Id.* ¶¶ 21-22; Filing No. 32-4, Consent Form).

Winters ordered Nash to stay in the squad car while he went to the U-Haul and asked Williams to sign a consent to search form. (Nash Aff. ¶ 24; Williams Aff. ¶ 16). She, like Nash, reluctantly agreed to sign the form because she did not know what would happen if she did not. (Williams Aff. ¶ 17).

Troopers Peter Stephan and Ben Rector arrived on the scene. (*Id.* ¶ 18; Nash Aff. ¶ 26). They questioned Nash outside, asking him many of the same questions as Winters. (Nash Aff. ¶ 26). Williams was then told to get in Stephan's and Rector's squad car.

3

(Williams Aff. ¶ 19). At this juncture, a video of the encounter began. (*See* Filing No. 34, DVD[2] of the Jan. 6 stop).

After quickly reading Williams her Miranda rights, Winters began questioning her about her relationship with Nash, what hotel they stayed in on their way from Atlanta to Chicago and what form of payment they used, why she was returning to Georgia, and whether he abused her. (Williams Aff. ¶ 20). Winters asked her about the clothes found in the U-Haul; they were in bags and many had tags on them. He asked her repeatedly how she paid for them. When he discovered she used credit cards, he asked her the last time she used them and what exactly she purchased. Williams informed Winters she could show him proof of her purchases on her iPhone, but he dismissed her suggestion. She also offered to show him her driver's license to verify her identity. (*Id.* ¶ 21). Instead, he asked her to write down her name (including middle name), birthdate, social security number, and her last three addresses. (*Id.*). Winters asked her what she did for a living, and after learning she worked in home health care, he informed her that in his experience, people who work in home health care tend to: (1) steal pills; (2) steal credit card information; and/or (3) steal other's identification. He informed her their conversation was on video, and that it said a lot about her demeanor and whether she was telling the truth. Being truthful is important, he continued, because a judge takes that into account during sentencing. Williams was in the squad car for over forty minutes. When

---

[2] The rest of the facts are based in part on the video footage of the stop.

he was through, he told her to get in his squad car, where she was questioned by Rector and Maynard. (*Id.* ¶ 22).

Winters then questioned Nash again in Stephan's and Rector's squad car. Stephan was in the squad car also. (*Id.* ¶ 31). Winters again questioned Nash about his relationship with Williams and her decision to move back to Atlanta. (*Id.*). Winters accused Nash (and Williams) of stealing clothes, running a credit card scam, and of identity theft. (*Id.*). Winters asked Nash if he was just a witness, a co-conspirator, or the mastermind of the criminal enterprise. (*Id.* ¶ 32).

In total, Nash and Williams were detained for approximately two and a half hours. (Nash Aff. ¶ 35; Williams Aff. ¶ 24). Nash was given a Traffic Warning Ticket for violating Ind. Code § 9-21-8-11(c). (Filing No. 32-5, Warning Ticket).

## II. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Payne*, 337 F.3d at 771.

5

**III. Discussion**

As an initial matter, Plaintiffs agree that the state of Indiana and Troopers Winters and Stephan in their official capacities are not "persons" who can be sued under 42 U.S.C. § 1983. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 claims against the state of Indiana, and Winters and Stephan in their official capacity, is **GRANTED**. Plaintiffs also agree to dismiss the two unknown ISP Troopers. Defendants' Motion is therefore **GRANTED** with respect to all claims against the two unknown ISP Troopers.

**A.     Federal Section 1983 Claims**

The court begins its discussion with Plaintiffs § 1983 Fourth Amendment claims for unreasonable seizure, false arrest, and unreasonable search against Winters and Stephan individually. Section 1983 provides a private cause of action against a person who, acting under color of state law, deprives an individual of any "'rights, privileges, or immunities secured by the Constitution and laws'" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983). "Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced." *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003).

Troopers Winters and Stephan raise the defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To defeat the defense, a plaintiff must establish two elements: (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* at 232. The court has discretion to determine in which order the questions should be answered; "a negative answer to either one is enough to establish the defense of qualified immunity." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

1. **Unreasonable Seizure Claim Against Trooper Winters**

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. amend IV. A law enforcement officer's temporary detention of a person during a traffic stop is a seizure of the person and, to pass constitutional muster, must be reasonable under the circumstances. *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). Officers may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

Winters gave Nash a traffic warning for "unsafe lane movement" in violation of Indiana Code § 9-21-8-11(1). That statutory section reads:

> Whenever a roadway has been divided into three (3) or more clearly marked lanes for traffic, the following rules apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from the lane until the person who drives the vehicle has first ascertained that the movement can be made with safety.

7

The parties disagree[3] on whether the trailer crossed the fog line. (*Compare* Winters Dep. at 59 ("The trailer was on and over the fog line over [sic] almost five times"), *with* Nash Aff. ¶ 8 ("Neither the U-Haul nor its trailer crossed the . . . fog line")). Notwithstanding this dispute of fact, Winters argues Plaintiffs have not raised a *material* issue of fact on whether he observed Plaintiffs engage in "unsafe movement," which is different from crossing the fog line. His argument is a distinction without a difference. His understanding of crossing the fog line *is* unsafe lane movement. (*See* Winters Dep. at 59 ("Q: So all you could see was the trailer going over the fog line? A: Yes. Q: Why did you stop the vehicle? A: Unsafe movement."); *see also id.* at 60-61 ("Q: What did you consider to be unsafe about the trailer going over the fog line? A: The vehicle was operating on the emergency shoulder, the trailer was.")). Therefore, the court finds there exists a genuine issue of material fact on whether Winters had reasonable suspicion to stop Plaintiffs.

The law is clearly established that a stop without reasonable suspicion violates the Fourth Amendment. *Terry*, 392 U.S. at 30. Accordingly, Winters is not entitled to qualified immunity for the allegedly unlawful seizure.

### 2. Unlawful Search Claim Against Troopers Winters and Stephan

Consent to search is an exception to the warrant requirement. *Schneckloth v.*

---

[3] Maynor, the driver of the squad car, testified he could not recall why Plaintiffs were stopped. (Filing No. 32-3, Deposition of Colton Maynor ("Maynor Dep.") at 30) ("Q: All you know is you stopped them. You don't know why, correct? A: Correct.")). In fact, Maynor could not recall any details of the stop. (*See* Maynor Dep. at 8, 9, 14, 17, 22, 29, 30, 36).

*Bustamonte*, 412 U.S. 218, 219 (1973). For a warrantless search premised on consent to be valid, "the key consideration is whether 'the consent was freely and voluntarily given—a factual question to be determined by the totality of the circumstances.'" *Huff*, 744 F.3d at 1008 (quoting *McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1178 (7th Cir. 1993)). Winters claims Nash and Williams consented to the search; they deny as much. Nash testified he signed the Consent Form after twenty minutes of questioning in an ISP squad car because he "didn't feel he had a choice." (Nash Aff. ¶¶ 20-21). Williams signed the Consent Form because she was "frustrated and anxious about why [they] were stopped and what the officers were doing with [Nash] in the police car for so long," and she "did not know what would happen to [her] if [she] did not sign the consent to search." (Williams Aff. ¶ 17). If the jury believes Plaintiffs, there would be a strong case for lack of voluntariness, especially given the circumstances of this case, where the Plaintiffs were stopped on an interstate highway and did not feel free to leave. (Nash Aff. ¶ 38; Williams Aff. ¶¶ 11, 21). Accordingly, the court finds a genuine issue of material fact exists on whether Plaintiffs voluntarily consented to the search of the U-Haul and vehicle.

### 3. False Arrest Claim Against Troopers Winters and Stephan

A traffic stop can become an "arrest" if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made. *Huff*, 744 F.3d at 1005 (citing *Illinois v. Ceballes*, 543 U.S. 842, 405, 407 (2005)). "'For an investigatory stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the

stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment rights.'" *Id.* (quoting *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011)).

As noted previously, Winters pulled Plaintiffs over because he noticed the trailer cross the fog line. As he walked up to the U-Haul, Winters noticed the vehicle in tow (Williams' Mercedes) was not "heavily burdened" with property. (Winters Dep. at 80). In his experience, given the size of the U-Haul, individuals who are legitimately moving long distances also fill the vehicle in tow with personal belongings. (*Id.*). After asking Nash if he had been drinking or using his cell phone, Winters asked Nash for his driver's license and the U-Haul registration and went to his car. (Nash Aff. ¶ 11). There is no evidence that the check of Nash's license or U-Haul registration revealed anything out of the ordinary; yet, he ordered Nash into his squad car for additional questioning. Nash was questioned two additional times; Williams was questioned at length in Stephan's squad car.

A person is under arrest for purposes of the Fourth Amendment if he or she does not feel free to leave. "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

Viewing the evidence in the light most favorable to Plaintiffs, the court finds a reasonable person in their position would not have felt free to leave. Nash and Williams

were on the side of an interstate highway with two squad cars behind their U-Haul. After their vehicles were searched; they were questioned by uniformed officers Winters and Stephan at length in separate police squad cars over not only their relationship, but also possible criminal activity. Neither Nash nor Williams were free to leave. (Williams Aff. ¶ 11; Nash ¶ 33).

Qualified immunity in the context of a false arrest claim "provides shelter for officers who have 'arguable probable cause' to arrest—i.e., those officers that reasonably but mistakenly believe they have probable cause." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) (citing *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714-15 (7th Cir. 2013)). Here, the parties dispute the reason (or lack thereof) for the stop. Moreover, there is neither evidence Winters' check of Nash's license revealed anything suspicious, nor evidence that Nash was inebriated or checking his cellphone while driving. Consequently, the court must find Winters and Stephan did not have arguable probable cause to arrest and, therefore, they are not entitled to qualified immunity.

### B. State Law Claims

The court now turns to Plaintiffs' state law claims for unreasonable search and seizure under Article 1, § 11 of the Indiana Constitution and false arrest and false imprisonment under the Indiana Tort Claims Act.

#### 1. Article 1, § 11

Article 1, § 11 provides:

The right of the people to be secure in their persons, houses, papers, and effect, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or

11

> affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

The Indiana Supreme Court construes § 11 liberally "to protect Hoosiers from unreasonable police activity in private areas of their lives." *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002). "Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims, [the Court] place[s] the burden on the State to show that under the totality of the circumstances its intrusion was reasonable." *Id.* The reasonableness of a search or seizure turns on a balance of: "(1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

As noted in the court's Fourth Amendment analysis, the entire premise of the stop—not to mention the lengthy detention in ISP squad cars over matters unrelated to the initial purpose of the stop—is in dispute. Accordingly, the court must find there is a genuine issue of material fact on whether the police intrusion by Winters and Stephan was reasonable under the circumstances.

### 2. Consent to Search

Like its federal counterpart, consent to search under Indiana law is an exception to the warrant requirement, and is valid "except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law." *Browder v. State*, 77 N.E.3d 1209, 1217 (Ind. Ct. App. 2017) (quoting *Navarro v. State*, 855

N.E.2d 671, 675 (Ind. Ct. App. 2006)). "Whether consent to search was voluntary is a question of fact determined from a totality of the circumstances." *Id.* at 1217.

For the reasons set forth in the court's Fourth Amendment consent analysis, there exists a genuine issue of material fact on whether Plaintiffs' consented to the search of the U-Haul and vehicle.

### 3. False Arrest and False Imprisonment

Lastly, Plaintiffs bring false arrest and false imprisonment claims against the state of Indiana, the ISP, and Winters and Stephan in their individual and official capacities. Governmental immunity for the "enforcement of law" under the Indiana Tort Claims Act, Indiana Code § 34-13-3-3(8), does not extend to these torts.

"False imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller of City of Anderson*, 777 N.E.2d 1100, 1104 (7th Cir. 2002) (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001)). False arrest occurs when one is arrested in the absence of probable cause. *Id.* (citing *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. Ct. App. 1996)); *see also Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007) ("A false arrest requires absence of probable cause.").

The facts relating to the stop, subsequent search, and lengthy questioning are in dispute. Therefore, there exists a genuine issue of material fact on whether Plaintiffs were falsely imprisoned and/or falsely arrested as a result of the January 6 traffic stop.

## IV.     Conclusion

The court finds genuine issues of material fact exist surrounding all aspects of the subject stop which can only be resolved through trial. Accordingly, the court **DENIES** Defendants' Motion for Summary Judgment (Filing No. 32).


**SO ORDERED** this 26th day of September 2018.

                                              RICHARD L. YOUNG, JUDGE
                                              United States District Court
                                              Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.